# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| MATTHEW D. JOHNSTON, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:09-CV-137-PRC |
| ) | |
| JIM CHESTNUT and URS MIDWEST, INC. ) | |
| d/b/a URS AUTO TRANSPORT DIVISION, ) | |
|     Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on (1) Defendants' "Daubert Motion" to Exclude Opinion Testimony of Plaintiff's Expert J. Terrence Grisim Pursuant to Rule of Evidence 702 [DE 77], filed by Defendants URS Midwest, Inc. and Jim Chestnut on March 1, 2011, and (2) Plaintiff's Request for Oral Argument [DE 81], filed on March 29, 2011.

## PROCEDURAL HISTORY

On February 10, 2009, Plaintiff Matthew D. Johnston filed a Complaint in the Lake Superior Court against the Defendants, alleging negligence. On April 8, 2009, Defendants filed a Notice of Removal to this Court. On April 8, 2009, the Defendant URS Midwest, Inc. filed an Answer, and on April 5, 2010, Defendants URS Midwest, Inc. and Jim Chestnut filed an Amended Answer.

Defendants filed the instant *Daubert* motion on March 1, 2011. Johnston filed a response on March 29, 2011, and Defendants filed a reply on April 5, 2011.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, the Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

1

## FACTUAL BACKGROUND

On June 30, 2007, Defendant Jim Chestnut drove a truck pulling a car carrier trailer, owned by Defendant URS Midwest, Inc., onto the Blue Beacon Truck Wash entrance apron. Chestnut was then signaled to enter the wash bay by one of Plaintiff Matthew Johnston's co-workers. Upon entering the wash bay, Chestnut stopped and turned off the truck engine. Johnston and his co-workers began to soak and soap the truck's car carrier trailer. As Johnston maneuvered around to the rear of Chestnut's car carrier trailer, Johnston inadvertently stepped through an uncovered opening and into the wash bay's drainage pit, injuring himself. Normally, that portion of the wash pit was covered with a metal plate.

As Chestnut was driving into the wash bay, his truck and trailer passed over the plate and drainage pit. The drainage pit, which runs down the center of the wash bay, was covered with a series of plates and grates. In his Complaint, Johnston alleges that his injuries were proximately caused by an unsecured chain hanging from Chestnut's car carrier trailer that dislodged a metal plate normally covering the wash bay drainage pit.

No eye witnesses have testified or offered how or when the metal plate was moved. Chestnut denies that any chain was hanging from the trailer when he walked to the rear of the trailer while waiting to be waved into the wash bay. Johnston did not see a chain hanging from or dragging behind the trailer as it pulled into the truck wash or at any time prior to the accident. Neither Johnston, Chestnut, or any Blue Beacon employee witness heard any noise arguably consistent with the metal plate being lifted and flipped onto the adjacent metal plate and concrete floor. No witness testified that he or she saw the chain dislodge the plate. Johnston did not see any chains after the incident, either while he was in the pit or after he was pulled out of the pit.

After Johnston fell in the pit, David Milam, a co-worker, came upon him to help him out of the pit. At that time, Milam saw three chains with hooks at the end, extending three feet from the back of the car carrier trailer. He described the hooks as "an S shape twisted at the end." Pl. Br., Exh. D., p. 3 (Milam's May 20, 2010 statement). He said he saw the drain pit cover plate folded over on top of the next plate. He stated that one of the hooks was within a foot of the plate. He said, "Yeah, right over the top of it where you could see that it actually lift[sic] it." *Id*.

Ron Gass, the truck wash manager, reported during his statement (which he gave immediately following Milam's statement, for which he was present) that he saw only one safety chain hook lying about a foot away from the dislodged plate following the accident. Regarding the hook, he said, "Yeah it just pulled one grate up." *Id*. at p. 5.

In response to Johnston's Interrogatory No. 6, Chestnut, the truck driver, answered: "Mr. Chestnut walked to back of truck and saw that the grate was opened up at that time. A chain from the trailer was hanging off of the trailer." Pl. Br., Exh. J, p. 3.

There is no evidence that the plate was already removed and the pit exposed when Chestnut drove his truck into the truck wash. Milam testified that the pit is not exposed during work hours, that the plate is removed only to clean out the pit, and that when the pit is exposed, the manager is present.

Johnston retained liability expert J. Terrence Grisim, a safety engineer, to offer opinion testimony in this case. On July 1, 2010, Grisim submitted his report, providing four "Conclusions":

> 1. The design of the floor grates in this truck wash are typical of those used in the auto and truck maintenance industry.
>
> 2. Dragging an unsecured chain or chains is a violation of the FMCSA regulations as quoted above.

3. It is more likely than not that the dragging chain pulled the pit cover open causing the unguarded floor opening over the pit into which the plaintiff fell.

4. In my opinion Jim Chestnut,[sic] violated the motor carrier industry standard of care and the guidance contained in both Section 5(d) of the United Road Services, Inc. Independent Contractor Service Agreement and section 392.9 of The Federal Motor Carrier Safety Regulations[sic] Also, that negligence was the cause of the plaintiff's injuries.

Def. Br., Exh. A, p. 3.

## DISCUSSION

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, "[t]he district court is a 'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-52 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)). Courts use a three-step analysis to determine the admissibility of expert testimony: (1) whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (2) whether the subject of an expert's testimony is "scientifically reliable," and (3) whether the testimony will "assist the trier of fact to

understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904; *see also Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

In his report, Grisim gives opinions in three areas: (1) negligence/causation regarding the June 30, 2007 incident (Conclusions 3 and 4); (2) the general design of floor grates in the auto and truck maintenance industry (Conclusion 1); and (3) whether an unsecured chain is a violation of the Federal Motor Carrier Safety Regulations (Conclusion 2). The Court considers each opinion area in turn.

### A. Negligence & Causation Opinions

In the instant motion, Defendants ask the Court to bar Grisim's report and testimony, arguing that Grisim's negligence and causation opinions fail to comport with the requirements of Federal Rule of Evidence 702. The Court finds that Grisim's "bottom line" opinions as to negligence and causation in this case are not reliable nor will they assist the jury.

A district court is granted "broad latitude when it decides how to determine reliability." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999). For an expert opinion to satisfy the reliability requirement, the expert must be qualified in the relevant field and the expert's opinion must be based on sound scientific or other relevant methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). *Daubert* lists several relevant considerations for evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. 509 U.S. at 593-94. This is not a rigid check list; rather, the test of reliability is "flexible," and "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (quotations omitted). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that

5

characterizes the practice of an expert in his field. *Id*. at 152. In *Kumho*, the Court articulated that strict adherence to the *Daubert* reliability factors was not necessary; rather, the factors are examples of criteria that a trial court may use to determine whether the expert, in offering the opinion, acted as an expert in the relevant field. *Id.* at 151-52.

Grisim's negligence and causation opinions are speculative and not based on scientific analysis. His opinions that a dragging chain pulled the pit cover plate open causing the unguarded floor opening into which the plaintiff fell, that Chestnut violated the industry standards of care and the Federal Motor Carrier Safety Regulations by allowing a loose chain, and that Chestnut's negligence caused plaintiff's injuries are predicated on the assumptions drawn by him in the first two paragraphs of his "Discussion" on page 2 of the report:

> The Blue Beacon incident report states that the accident in question occurred at about 1:19 PM on June 30, 2007 at the Lake Station #12 truck wash. This truck wash is located at Flying J, Lake Station, Indiana. Jim Chesnut[sic], an agent of defendant URS Midwest was operating a semi-tractor trailer truck at this truck wash. He drove his vehicle into the truck wash dragging a cargo securement chain which hooked on a floor grate in the truck wash, pulling it open creating an unguarded floor opening into which the plaintiff fell.
>
> Both Blue Beacon employees said that Chesnut's[sic] trailer was dragging a chain or chains with hooks that pulled open the floor drain grate into which Matthew Johnston fell. David Millam said "It was folded over on top of the other one." He further stated that he saw three chains with hooks lying right over it, actually, a foot from it. Mr. Gass said "yeah it just pulled one grate up." He also said when he came on the scene the hook way[sic] lying a foot in front of the pulled up grate.

Def. Br., Exh. A, p. 2. At his deposition, Grisim surmises that a chain must have come loose from the car carrier trailer when Chestnut adjusted his car carrier trailer ramps for washing immediately prior to entering the bay and that a hook on the end of a fallen chain caught and flipped open the plate as Chestnut drove into the wash bay.

6

However, as confirmed throughout his deposition testimony, Grisim offers no "scientific" or other method for coming to these conclusions. He conducted no scientific analysis of the chain, hooks, or plate. He performed no testing of the Blue Beacon plate/grate system, did not measure the plates, did not weigh the plates, and does not know the configuration of the plates on June 30, 2007. He does not know whether the edges of the plate were flush to the surrounding concrete on June 30, 2007. Grisim does not know whether photographs he reviewed in preparing his report depicted the configuration of plates in place at the time of the 2007 accident. He did not attempt to reconstruct the accident. He did not test or inspect Chestnut's car carrier or its chains. He offers no explanation, other than a bald conclusion, as to how Chestnut's trailer chain could hook, catch, and dislodge the plate.

Although he is aware that changes were made, Grisim does not know what the alterations were to the Blue Beacon plates, floor, and the dimensions of the wash bay pit in question following the occurrence in 2007; this is significant because he bases his report, in part, on his inspection of the Blue Beacon truck wash bay on May 20, 2010. During his site inspection on May 20, 2010, Grisim did nothing other than listen as Milam and Gass gave their statements. During the 2010 inspection, Grisim did not take photographs, perform any tests, lift any plates, or take any measurements. Grisim does not know who manufactured the grates and plates used at the Blue Beacon facility or when they were manufactured. Grisim does not know whether the configuration of the plate covering the drainage pit in 2007 is the same as the configuration present at the site inspection on May 20, 2010.

As for Chestnut's truck, Grisim does not know what gear Chestnut was in when he entered the wash bay or whether he was accelerating or idling. Grisim has never examined, seen, weighed,

7

or measured the actual chain allegedly involved in the incident, even though it was preserved. He did not request to see the chain. Due to the poor quality of the limited photographs he reviewed, Grisim could not "really tell" the type of hooks on the chain allegedly involved and how many hooks were on the chain. He does not know the dimensions of the hook that allegedly dislodged the plate. Grisim cannot determine the necessary gap space between the metal plate and the concrete flooring required for one of the hooks on the chain's end to catch and dislodge the plate.

Similarly, Grisim lacks knowledge and a factual basis regarding the car carrier driven by Chestnut. Grisim offers, without any factual basis, that a chain became unsecured shortly before the car carrier entered the wash bay and that a chain fell when Chestnut adjusted the ramps on the car carrier trailer to a "wash configuration": "Well, you're moving the platforms on which they're attached. So you're changing distances and tensions possibly. I mean, I didn't have the opportunity to examine it, so I don't know precisely what happened. I'm just saying that's probably the most likely." Def. Br., Exh. B, p. 47 (Grisim dep.). Grisim cannot identify which chain allegedly caused the incident and cannot confirm that the chain would have been affected when Chestnut adjusted his trailer ramps to "wash configuration." Grisim does not know if the allegedly unsecured chain was attached to one of the decks that is capable of moving up and down. He cannot say which of the chains on the car carrier was unsecured at the time of the incident. Grisim does not know how many chains would have been located on the left side of the car carrier trailer or where the involved chain was attached to the trailer. Grisim has never moved the decks on a car carrier. He performed no scientific analysis to determine how the chains became unsecured. He has no experience with car carriers from previous cases, none of his publications involve car carriers, and none of his safety standards work involved car carriers.

Defendants argue that it is possible that the jury may believe that something other than the negligence of Chestnut caused the chain to become dislodged from the car carrier. In fact, Defendants intend to introduce evidence at trial that the only way for the chain to have fallen in a manner described by Chestnut was for a bungee cord to have been manually disconnected. Therefore, how the chain became dislodged is at issue, and Grisim's speculation is insufficient. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand) (recognizing that "the expert's bald assurance of validity is not enough").

Grisim did not perform any biomechanical analysis of the June 30, 2007 incident, did not perform an accident reconstruction analysis, and did not perform any analysis to determine whether it was possible for a hook to catch the plate and dislodge it. Grisim identified a photograph at his deposition as showing a possible gap between the plate and the concrete that could have resulted in a hook getting under the plate and lifting it; but he admitted that he does not know whether the plate in the photograph was the same diamond plate presented when he conducted his site inspection in 2010.

The only analysis that Grisim did in support of his opinion was to review the Federal Motor Carrier Safety Regulations. Grisim did not review Chestnut's deposition transcript until after he prepared his report. Grisim did not speak to Johnston or review his deposition. None of Grisim's publications are relevant to the events alleged in this case, he has written no articles specific to the trucking industry, he has not lectured on the topic of unsecured truck chains, he has never dealt with

or seen a case involving a chain allegedly dislodging a floor plate, and he has never been retained, given a deposition, or appeared at trial in a case involving an unsecured vehicle chain causing injury.

Johnston attempts to justify Grisim's opinions as based on "specialized knowledge" to meet the reliability element of *Daubert*, *Kumho*, and Rule 702, arguing that Grisim's training and experience as a safety engineer allows him to draw conclusions without the use of scientific analysis. The language of Federal Rule of Evidence 702 "makes no relevant distinction between scientific knowledge and technical or other specialized knowledge [and] makes clear that any such knowledge might become the subject of expert testimony." *Kumho*, 526 U.S. at 147. "As a matter of language, the Rule applies its reliability standard to all scientific, technical, or other specialized matters within its scope." *Id.* *Kumho* postulated this rule with the goal of not complicating the district courts' "gatekeeping obligation" with a confusing evidentiary rule demarcating nuances between disciplines. *Id.* at 148.

In this case, the distinction between whether Grisim's testimony is based on specialized knowledge or scientific knowledge is of little relevance as either classification is still subject to the principles of Rule 702 and *Daubert*. Moreover, Grisim is a safety engineer who was retained for the purpose of giving an opinion about the incident in which Johnston was injured on June 30, 2007. He his given opinions on negligence and causation in a case in which no one saw or knows how the chain became dislodged from the car carrier or whether the chain/hook in fact lifted the plate and exposed the drainage pit. As a result, this situation calls for more than general conclusions based on broad experience in the trucking industry.

"Disciplines such as engineering rest on scientific knowledge," and Grisim is a safety engineer. *Id.* At his deposition, Grisim defined the field of safety engineering:

> Basically what a safety engineer does on a broad basis is to keep people from being hurt. I mean, you identify things that can cause injury and you construct programs or guards or whatever other procedures may be appropriate to prevent that from happening. Our mission statement says, "We protect people, property, and the environment."

Pl. Br., Exh. H, p. 84. Moreover, this is a case in which scientific analysis is appropriate to the primary questions of (1) how the chain originally become dislodged from the car carrier and (2) whether it was possible for the chain to dislodge the plate covering the pit into which Plaintiff fell. These are two questions in which the results from one expert can be tested and proven or disproven by another expert through the use of scientific methods.

Where no eyewitnesses are available to testify as to these questions, experts can rely on alternate hypotheses to determine how an accident may have occurred; however, the "hypothetical alternatives must themselves have analytically sound bases so that they are more than mere speculation by the expert." *Pierce v. Chicago R. Link, LLC*, No. 03C7524, 2005 WL 599980, at *5 (N.D. Ill. Mar. 15, 2005) (internal quotation marks omitted) (citing *Smith*, 215 F.3d at 718-19 (quoting *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998))). While Grisim draws his conclusions as to negligence and causation based on assumptions made from the statements of post-occurrence witnesses Milam and Gass, his analysis remains devoid of any scientific inquiry.

Johnston also attempts to rehabilitate Grisim's reliability by arguing that Grisim concurs with and adopts the tests of Defendants' expert, James Whelan. An expert's opinion should not be rejected as unreliable simply because the expert relied on the reports of others. *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) (recognizing that courts have found experts who have relied on the reports of others to be reliable but noting that the testifying expert's opinion should be rejected if too speculative). Rather, experts may rely on data and other information that is supplied

11

by third parties. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000). "Either 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field' may suffice as a reasonable methodology upon which to base an opinion." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (quoting *Cummings v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996)).

However, Grisim did not rely on and *could not* have relied on Whelan's findings in formulating his own opinions and authoring his report. Grisim submitted his report on July 1, 2010; Whelan did not author his report until August 31, 2010. At his deposition on February 15, 2011, Grisim testified that he did not view Whelan's report, but was only shown some pictures from it prior to giving his deposition and had no opinions as to the contents of Whelan's report. Although Johnston suggests that Grisim concurs with Whelan's technical data and measurements, Grisim's deposition testimony belies any such knowing agreement. During the deposition, counsel for Johnston posed to Grisim a series of hypothetical questions that utilized measurements collected by Whelan. At no time was Grisim told that the measurements used in the hypothetical questions were Whelan's findings. Furthermore, Grisim did not testify that he was adopting these measurements, but rather that the data did not change his previously articulated opinions.

Johnston also attempts to rehabilitate Grisim's opinions by positing that Grisim "reviewed detailed records." Pl. Br., p. 2. Grisim reviewed (1) Johnston's Complaint; (2) the Answer to the Complaint and the affirmative defenses; (3) Chestnut's answers to Johnston's combined set of interrogatories and requests for production; (4) Johnston's answers to interrogatories; (5) the Blue Beacon incident report; (6) the May 20, 2010 statements of Milam and Gass; (7) URS Midwest, Inc.'s answers to Johnston's combined first interrogatories and requests for production; (8)

12

Defendants' answers to discovery; (9) Federal Motor Carrier Safety Regulations Part 392.9: Inspection of cargo, cargo securement devices and systems; (10) United Road Services, Inc. independent contractor service agreement; and (11) a site visit to the Blue Beacon truck wash in Lake Station, Indiana, on May 20, 2010. Def. Br., Exh. A, p. 1-2.

The Complaint, Answer to the Complaint, Federal Motor Carrier Safety Regulations, and the URS contract do not provide Mr. Grisim with any facts or data that help him make findings about how the car carrier's chains originally became dislodged or if it was even possible for the chains to lift the plate. Grisim collected no facts or data during his site visit. In his deposition, Grisim stated that he did not perform any testing, did not take any photographs, did not lift any plates, did not measure any of the plates, and did not perform a reconstruction analysis of the events in question. As discussed above, Milam and Gass are post-accident witnesses, neither of whom witnessed the chain lift the plate.

Notably, of all the documents he reviewed, Grisim never read Johnston's deposition, which included a description of the wash bay, the configuration of and details about the plates and grates covering the drainage pit, changes in the grates and plates from 2007 to 2010, and an account of the accident. Grisim did not speak with Johnston. Although Grisim reviewed two incident reports, neither report was prepared by Johnston, and neither report serves as a sufficient substitute for Johnston's account of the incident as they provide little detail about the accident. The document entitled "Incident Report" contains in the section titled "Description of Incident" the following statement: "This customers [sic] trailer had a loose safety chain dragging behind his trailer causeing [sic] an injury to an employee." Pl. Br, Exh. I, p. 4. Similarly, the document entitled "First Report of Injury Form" provides in the section asking for details of the events that resulted in injury:

13

> While pulling into bay 3 an auto carrier with a loose safety chain (dragging the bay floor) on the back of the trailer, hooked the first solid pitt[sic] grate & flippin[sic] it over.
> Matt Johnston was soaping the trailer & unaware of the opening of the pitt[sic], made the corner to soap the back of the trailer & fell into the pitt[sic] opening.
> Matt struck his right hip & lower rib section on the wall of the pitt[sic].

*Id.* at p. 3. Both reports are dated June 30, 2007, the day of the incident, and were prepared by Gass, who was not present when the incident occurred. Johnston testified at his deposition that he did not see a loose chain before, during, or after the incident and only subsequently learned of the chain from Gass. Grisim also did not view or inspect the chain that was the potential cause of the accident before making his findings. Defendants had removed the chains attached to the trailer, preserved them, and made them available to Grisim upon request. Grisim did not do so.

This is not an instance, as Johnston argues, that "shaky" expert testimony is admissible but assailable through cross-examination. Nor is it a case in which general experience in the field of safety engineering is sufficient. Although Johnston notes that Grisim has been "qualified" in ten federal lawsuits, Johnston has provided no supporting documentation to show the subject matter of Grisim's opinion and/or testimony (if any) in those cases and to what extent the court in those cases made findings regarding Grisim's qualifications. More importantly, Grisim's qualification as an expert in other litigation does not change the lack of scientific analysis underpinning his opinions in this case. Accordingly, Grisim's negligence and causation opinions are speculative and lack sufficient scientific analysis and, thus, are not reliable.

In addition, Grisim's negligence and causation opinions, unsupported by scientific analysis, will not assist the jury and, thus, are not relevant. Johnston contends that the standard of relevance is met because Grisim's testimony will aid the jury in determining how the plate became dislodged

and assessing the risks associated with dragging chains. However, the general concept that a hook at the end of a chain could catch an item is a matter understood by the average juror. "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Amakua Dev. LLC v. Warner*, No. 05 C 3082, 2007 WL 2028186, at *6 (N.D. Ill. July 10, 2007) (citing *Taylor v. Illinois Cent. R.R. Co.*, 8 F.3d 584, 586 (7th Cir. 1993)). "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under [Federal Rule of Evidence] 403." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

In support of Grisim's causation testimony, Johnston cites *Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996), for the principle that a court is not required to exclude expert testimony "just because the testimony may, to a greater or lesser degree, cover matters that are within the average [person's] comprehension." *See Tyus*, 102 F.3d at 263 (citing *Hall*, 93 F.3d at 1342). *Tyus* is distinguishable from the case at bar. In *Tyus*, the Seventh Circuit reversed the trial court's ruling excluding a social scientist from testifying in a Fair Housing Act case. *Id.* at 264. The expert intended to testify about how advertising conveys a message to its target market and how an all-Caucasian advertising campaign affects African-Americans. *Id.* at 262. To support his testimony, the social scientist utilized the focus group method to gather research data upon which to base his conclusions. *Id.* at 264. In reversing the trial court's ruling, the appellate court reasoned that "social scientists in particular may be able to show that commonly accepted explanations for behavior, when studied more closely, [are] inaccurate." *Id.* at 263.

In this case, Grisim is not a social scientist but a safety engineer, who has given an opinion about negligence and causation related to a physical accident. The central negligence and causation issues are how a chain came to be hanging from the car carrier trailer and whether and how the car carrier chain lifted the plate covering the pit into which Johnston fell. Regarding these issues, Grisim has not and will not present any testimony beyond a common human understanding about the danger of unsecured chains and uncovered pits in an industrial setting. An average juror knows that a hook can catch items. An average juror may *not* know the physics of whether a chain with a hook hanging from a car carrier is capable of hooking, catching, and flipping a metal plate in a car wash bay, and expert testimony based on such scientific analysis would be relevant. The expert in *Tyus*, a social scientist, utilized scientific analysis in developing his conclusions by conducting studies with focus groups, utilizing the defendants' advertising campaign. *Id*. at 264. In contrast, Grisim did not rely on any scientific methods in authoring his expert report and, thus, has nothing more to offer than an average human understanding of inherent dangers.

Accordingly, finding that Grisim's opinions in Conclusions 3 and 4 of his July 1, 2010 report are not reliable or relevant, the Court grants Defendants' *Daubert* Motion as to Grisim's negligence and causation opinions. Grisim may not offer expert testimony as to how the chain came dislodged from the car carrier trailer, that Chestnut was negligent in allowing the chain to hang or drag from the car carrier trailer, or regarding how the plate covering the wash bay drainage pit was removed. Consistent with this ruling, Grisim may not give testimony describing the incident as he does in the first two paragraphs of the "Discussion" on page 2 of his report, which draw assumptions from evidence in this case.

### B. Design of the Floor Plates; Violation of Safety Regulations

In the instant motion, Defendants do not specifically oppose Grisim's opinion in Conclusion 1 that "[t]he design of the floor grates in this truck wash are typical of those used in the auto and truck maintenance industry" or Conclusion 2 that "[d]ragging an unsecured chain or chains is a violation of the FMCSA regulations as quoted above." Def. Br., Exh. A, p. 3. In contrast, Johnston argues extensively in his response brief, that Grisim, as a safety engineer, is qualified to provide expert insight to the jury regarding the standard of care applicable in this case by providing testimony about the regulations and customs concerning trucks and chains and whether the truck wash was safe in the context of the events and injuries.

Defendants do not contest that Grisim is an expert on fleet safety with a knowledge of trucking regulations and customs. Grisim is a board certified safety engineer with a specialty certification in fleet safety, which focuses entirely on motor vehicle and truck fleet safety. He is a member of the North American Transportation Management Institute. In addition, Grisim is certified in risk evaluation. In his career, Grisim has consulted as to safety for a nationwide tanker fleet, for an insurance servicer for a trucking company, for an insurance company including truck fleet operations, and for the United States Postal Service. Grisim testified that, during his employment with American Mutual Liberty Insurance, he advised and consulted on how trucks should enter and leave places and how they should load and unload. Furthermore, he affirmed that fleet safety involves the securing of truck loads, which inherently involves the use of chains. Grisim is also familiar with truck operations in water and cleaning settings. In his written report, Grisim notes that "[i]n my 42 years of trucking industry experience I have reviewed at least hundreds of

17

accidents. That body of knowledge including my experience with my industry colleagues leads me to conclusions included in my preliminary report." Def. Br., Exh. A, p. 3.

1.  *Design of the Floor Plates & Safety of the Wash Bay*

   a.   Design Floor Plates

The Court finds that Grisim is qualified to give testimony consistent with Conclusion 1 regarding the design of the floor grates and plates over the drainage pit in this wash bay. His experience in various industries with a "wet process" makes his testimony reliable. The common lay person is unlikely to have knowledge of these drainage configurations. Accordingly, the Court finds Conclusion 1 and related testimony admissible.

   b.   Safety of the Wash Bay

Johnston argues that Grisim's opinion testimony should also cover "the safety of the general area," Pl. Br., p. 2, and that "Grisim's opinions from a safety viewpoint is that the truck wash operation was safe for the purposes intended," *id*. at p. 6. Grisim's report does not contain any analysis or conclusions regarding the general safety of the wash bay or its compliance with OSHA regulations. In his deposition, Grisim testified generally about the safety relevance of a wash pit cover plate that is raised above the level of the surrounding concrete or of a raised bolt on the plate, explaining that any applicable safety regulations are relevant to pedestrian safety (such as tripping).

Based on his deposition testimony regarding his experience with OSHA regulations, Grisim *is* qualified to testify *generally* about the purpose of the applicable safety regulations and is qualified to respond to hypothetical questions regarding the safety of various wash bay configurations and whether certain conditions would violate OSHA regulations. *See* Def. Br., Exh. B, pp. 67-71. However, any *specific* testimony by Grisim related to the *actual* safety of the wash bay on June 30,

2007, or even on June 20, 2010 (the date of his site visit), for that matter, suffers from the same deficiencies as his causation testimony for lack of measurement and scientific analysis and is excluded.

Johnston argues that, because Defendants' expert Whelan has a theory that the lip of the plate had to be raised sufficiently or bolts on the plate had to be raised sufficiently for the chain hooks to catch the plate and flip it open and that the raising of either the lip or the bolt to that degree would violate OSHA guidelines, Grisim must be permitted to give opinion testimony to counter Whelan's testimony. The critical difference between Grisim's testimony and Whelan's is that, from the evidence submitted to the Court, Whelan conducted testing of the plate and hook to evaluate the conditions under which a plate could be flipped by a chain and hook. Grisim did no such testing, and, thus, he may not testify regarding whether the plate at issue in this case in fact violated OSHA regulations.

*2. FMCSA Regulations and Unsecured Chains*

Finally, in Conclusion 2 of his report, Grisim opines: "Dragging an unsecured chain or chains is a violation of the FMCSA regulations." Def. Br., Exh. A., p. 3. Based on his experience with fleet safety and his stated familiarity with the regulations, Grisim is qualified to give this opinion. He is qualified to testify generally about motor carrier safety regulations and what may hypothetically constitute a violation of the FMCSA regulations under a given set of conditions.

## CONCLUSION

For all the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** Defendants "Daubert Motion" to Exclude Opinion Testimony of Plaintiff's Expert J. Terrence Grisim Pursuant to Rule of Evidence 702 [DE 77] and **ORDERS** that the testimony of Plaintiff

Matthew D. Johnston's expert witness J. Terrence Grisim is admissible to the limited extent set forth in this Opinion and Order. The Court **DENIES as moot** the Request for Oral Argument [DE 81].

So ORDERED this 16th day of September, 2011.

s/ Paul R. Cherry  
MAGISTRATE JUDGE PAUL R. CHERRY  
UNITED STATES DISTRICT COURT

cc: All counsel of record